# IN THE UNITED STATES DISTRICT COURT FOR

# THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SHAWNA JENNINGS,<br><br>        Plaintiff,<br><br>v.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY and GROUP SHORT TERM DISABILITY PLAN FOR EMPLOYEES OF INTERMOUNTAIN HEALTH CARE, INC.,<br><br>        Defendants. | **MEMORANDUM<br>DECISION AND ORDER**<br><br>Case No. 2:15-cv-00683-RJS-EJF<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiff Shawna Jennings brings this action under the Employee Retirement Income Security Act, seeking to recover short-term disability benefits.[1] Jennings challenges the decision of Defendant Hartford Life and Accident Insurance Company to deny her claim. Hartford contends its decision was reasonable and supported by substantial evidence in the administrative record. Before the court are cross motions for summary judgment.[2] For the reasons discussed below, the court grants Hartford's Motion and denies Jennings' Motion.

## BACKGROUND

Jennings is a former employee of Intermountain Health Care, Inc. (IHC), and a participant in the Group Short Term Disability Plan for IHC employees (the Plan). According to the Plan, short-term disability benefits are payable to an employee who is "totally disabled."[3] A

---

[1] Dkt. 2 at 2.

[2] Dkt. 21; dkt. 22.

[3] R. at 000156.

claimant is "totally disabled" and thus eligible for benefits if she is prevented by injury, sickness, mental illness, substance abuse, or pregnancy from performing "essential duties of [the] occupation," and is therefore earning "less than 20% of [her] Pre-disability earnings."[4]  An essential duty is one that "1) is substantial, not incidental; 2) is fundamental or inherent to the occupation; and 3) cannot be reasonably omitted or changed."[5]  Hartford is the Plan's claims administrator,[6] and has discretionary authority to determine eligibility for coverage.[7]

Jennings suffers from spastic diplegia, a degenerative condition that affects her lower extremities and makes it difficult for her to walk.  In her position as a nurse auditor, Jennings was responsible for auditing medical charts and verifying medical codes.[8]  Finding it difficult to perform her job, Jennings applied to IHC for a leave of absence.  IHC approved the request in January 2015 and forwarded Jennings' documentation to Hartford for its review of her eligibility for short-term disability benefits.[9]  After an investigation, Hartford determined Jennings was not totally disabled and therefore denied the claim.  Jennings appealed the denial through the administrative appeal process, and Hartford upheld its decision.

---

[4] R. at 000163.

[5] R. at 000162.

[6] R. at 000161 ("Claims Administrator means Hartford Comprehensive Employee Benefit Service Company (HARTFORD CEBSCO).").

[7] R. at 000159 ("The Claims Administrator is delegated the duties of the Employer to: 1) determine benefits payable according to the terms and conditions of The Plan; and 2) make payment for benefits payable.").

[8] R. at 000146.

[9] R. at 000090.

## I.     The Administrative Recor

When both parties move for summary judgment in an ERISA denial-of-benefits case, the "factual determination of eligibility for benefits is decided solely on the administrative record."[10] Following is a summary of the administrative record at the time of Hartford's initial denial and subsequent appeal determination.

### A.   Initial Denial

Jennings initiated her benefits claim on January 21, 2015.[11]  Hartford investigated the claim by requesting information from Jennings' treating physicians and interviewing Jennings by telephone.[12]

Jennings' treating neurologist, Dr. Joseph Watkins, provided medical records for Jennings' November 24, 2014 and January 28, 2015 office visits. [13]  At the November visit, Dr. Watkins noted his findings as spastic diplegia, pain, stiffness, and gait difficulty.[14]  Jennings reported "the spasticity in her legs [was] getting worse . . . especially when walking, but also when sitting and standing now."[15]  Jennings also reported pain and stiffness in her legs, hips, and lower back, especially in the morning and at the end of a work day.[16]  The notes indicate Jennings had a "spastic scissor-type gait" and "ha[d] to concentrate quite a bit to walk well."[17]

---

[10] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006)).

[11] R. at 000148.

[12] R. at 000122-149.

[13] R. at 000101-110.

[14] R. at 000110.

[15] R. at 000108.

[16] R. at 000108.

[17] R. at 000108.

Dr. Watkins recommended Jennings increase her dosage of the medication Baclofen from 10 to 15 milligrams.[18]

At the January 2015 visit, Jennings reported worsening spasticity and muscle cramping in her legs, and Dr. Watkins noted Jennings' gait had "worsened over the past two months."[19]  Dr. Watkins lowered Jennings' Baclofen dosage back to 10 milligrams based on Jennings' report that the increased dosage caused daytime drowsiness and not much benefit.  Dr. Watkins referred Jennings to Dr. Michael Green for a consultation regarding Botox injections.[20]   He recommended Jennings "continue off work for now due to increasing symptoms and new medication trials."[21]

Dr. Watkins also completed an Attending Physician's Statement of Functionality (APS) form, in which he confirmed Jennings' diagnoses of spastic diplegia and gait difficulty.[22]  Dr. Watkins stated Jennings "will be undergoing a series of treatments for her condition and will be unable to work . . . [for an estimated] 30 days."[23]   However, he struck out the portion of the form relating to specific workplace restrictions and wrote "N/A" beside it.[24]  In response to the question "does the patient have a psychiatric/cognitive impairment?" Dr. Watkins checked the box "no."[25]

On February 10, 2015, a Hartford Medical Clinical Case Manager (MCCM) assigned to Jennings' case faxed Dr. Watkins a letter, asking him to clarify Jennings' capabilities and

---

[18] R. at 000110.

[19] R. at 000105, 106.

[20] R. at 000105.

[21] R. at 000107.

[22] R. at 000120-121.

[23] R. at 0000121.

[24] R. at 000121.

[25] R. at 000121.

functionality. The MCCM asked for medical evidence to support Jennings' "inability to work her sedentary occupation . . . as it was noted you have been treating her since 2010 for her spastic dipleg[ia] of which she was able to work with her condition."[26] Dr. Watkins's office called the MCCM to respond, and indicated Jennings was taking time off to "get used to medications" and receive Botox injections in her legs.[27] Dr. Watkins's office also told the MCCM "there are no specific [restrictions/limitations] as to the exact time how long [Jennings] may sit, stand or walk[,] just that [she] is unable to sit for long periods of time because of the cramping leg pain she gets."[28]

Hartford denied Jennings' claim on February 26, 2015.[29] In the denial letter, Hartford wrote that the record showed "no change or worsening of symptoms" from the November and January visits, and that "[t]he medical information provided does not show an impairment or worsening or symptoms that would prevent you from performing your sedentary job duties."[30]

B. Appeal Decision

Jennings appealed Hartford's denial on May 1, 2015, and provided additional documentation to support her claim.[31] Hartford referred the file to its Appeal Unit for an independent review and eligibility determination.[32] Hartford also retained a neurologist, Dr. Caroline M. Badeer, to conduct an independent medical review of Jennings' file.[33] Specifically, Hartford asked Dr. Badeer to provide "an objective assessment of [Jennings']

---

[26] R. at 000014.

[27] R. at 000140.

[28] R. at 000140.

[29] R. at 000011-12.

[30] R. at 000012.

[31] R. at 000092-93.

[32] R. at 000003.

[33] R. at 000033-34, R. at 000026-29.

restrictions/limitations based on your medical records review, your conversation(s) with the attending physician(s), and the individual's self-reported information."[34]

Jennings provided two letters from Dr. Michael Green, both of which stated that she would be unable to return to work until July 2015.[35] Jennings also included two letters from Dr. Watkins. The first excused Jennings from work until April 15, 2015 "due to her ongoing medical condition."[36] In the second letter, Dr. Watkins wrote, "[i]n my opinion, Shawna Jennings is unable to resume any type of gainful employment due to physical impairment. My expectation is that Ms. Jennings will see a continued decline in function over time."[37]

Jennings included with her appeal various medical records, including office notes from visits with Dr. Watkins and Dr. Green, and several physical therapy visits.[38] In his office notes, Dr. Green indicated that Jennings was "ambulatory" but that he discussed with her the possibility of using a wheelchair or other assistive device in order to prevent falls or injuries.[39] Dr. Green provided Jennings with Botox injections on April 2, 2015.[40]

In a written report provided to Hartford, Dr. Badeer summarized Jennings' medical records and the letters from Dr. Watkins and Dr. Green. Dr. Badeer tried unsuccessfully to speak with both doctors on the phone. However, Dr. Green provided a written response to Dr. Badeer's questions. In response to the question, "Could [Jennings] work in a seated position using the upper extremities only?" Dr. Green wrote:

---

[34] R. at 000033.

[35] R. at 000095, 96.

[36] R. at 000098.

[37] R. at 000098.

[38] R. at 000036.

[39] R. at 000042.

[40] R. at 000046.

At this time, Shawna does not seem to have upper extremity involvement, yet with her balance and gait difficulties it will be challenging for her to maintain a job; when she need to go to the restroom, answer phones, etc. Modifications could be provided which may give her the ability to return to work.[41]

Based on her review of the medical record and limited communication with Dr. Green, Dr. Badeer found Jennings "[could not] work in any position requiring standing or walking." She further noted that Jennings was "totally restricted from balancing, climbing stairs, bending, stooping, kneeling, squatting, and working at heights," and could not "use . . . foot controls or driv[e] due to the spasticity in her legs."[42] However, Dr. Badeer ultimately agreed with Dr. Green's assessment that "modifications could be provided to allow [Jennings] to go to work." Dr. Badeer concluded Jennings would be "able to work in a seated position full time, without any restrictions in the upper extremities."[43]

Hartford asked Dr. Badeer to opine whether Jennings' "condition ha[d] changed significantly" since January 19, 2015.[44] Dr. Badeer wrote that the location of Jennings' symptoms in the lower extremities had not changed, though the level of pain and cramping had increased. She also noted that Jennings could not tolerate higher doses of medications due to their sedating effects.

On June 24, 2015, Hartford upheld its denial of Jennings' claim based on its review of Dr. Badeer's report and the "totality of the information presented." Hartford informed Jennings "the medical information in the claim file does not support that you are totally disabled."

---

[41] R. at 000032.

[42] R. at 000028.

[43] R. at 000028.

[44] R. at 000028.

Hartford explained its finding that Jennings was "capable of performing in a sedentary occupation with restrictions."[45]  Jennings filed this lawsuit on September 22, 2015.

## ANALYSIS

### I.    Standard of Review

In an ERISA case, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record and the non-moving party is not entitled to the usual inferences in its favor."[46]

A denial of benefits is reviewed de novo, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[47]  Where a plan grants an administrator discretionary authority, the court employs a "deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[48]  Under that standard, a plan administrator's decision will be upheld "so long as it is predicated on a reasoned basis."[49]  The basis relied upon need not be "the superlative one," so long as the decision "resides 'somewhere on a continuum of reasonableness – even if on the low end.'"[50]  On the other hand, "[a] lack of substantial evidence often indicates an arbitrary and capricious decision;" substantial evidence is that "a reasonable mind could accept as sufficient to support a conclusion."[51]

---

[45] R. at 000006.

[46] *LaAsmar*, 605 F.3d at 796 (internal quotation omitted).

[47] *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[48] *LaAsmar*, 605 F.3d at 796 (quoting *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008)).

[49] *Adamson v. Unum Life Ins. Co. of America*, 455 F.3d 1209, 1212 (10th Cir. 2006).

[50] *Id.* (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999)).

[51] *Id.*

Jennings and Hartford agree the denial of benefits should be reviewed under an arbitrary and capricious standard.[52]  However, Jennings proposes a "diluted" version of that standard due to the existence of a purported conflict of interest arising because the Plan grants IHC – the payor – discretionary authority to make claims determinations.[53]

The Tenth Circuit uses a sliding scale approach when a conflict of interest exists in an ERISA case.[54]  Reviewing courts are to "dial back [their] deference" to a plan administrator operating under a conflict of interest "in proportion to the seriousness of the conflict."[55]

Here, IHC explicitly delegates its discretionary authority to Hartford.[56]  Furthermore, Hartford engaged an independent reviewer, Dr. Badeer, as part of its eligibility determination.  Thus, any conflict of interest arising out of IHC's dual role has been effectively mitigated and plays little to no role in the court's analysis.[57]

## II.    Abuse of Discretion Analysis

Jennings contends that Hartford's decision to deny her short-term disability benefits was arbitrary and capricious because Hartford: (1) disregarded medical documentation of Jennings' limitations; (2) failed to identify and consider all of the essential elements of Jennings' occupation; and (3) read into the Plan a condition that Jennings was not "totally disabled" if she could work with accommodations.  The court considers each of Jennings' arguments in turn.

---

[52] *See* dkt. 21 at 14; dkt. 22 at 5.

[53] R. at 000167.

[54] *Weber*, 541 F.3d at 1010.

[55] *Id.* (internal quotation omitted).

[56] R. at 000159.

[57] *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 126 (2008) ("[A conflict of interest] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy.").

A.  Information in the Medical Records

Jennings first argues Hartford failed to appropriately credit her physicians' opinions concerning her ability to work.  ERISA plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."[58]  However, administrators are also not required to accord "special weight" to those opinions, and reviewing courts may not impose a "burden of explanation" on administrators who credit evidence which conflicts with a physician's conclusion.[59]

Jennings alleges Hartford arbitrarily disregarded the following information:

> Dr. Watkins was unequivocal in saying that Shawna could not work.  Dr. Singleton verified that her symptoms were slowly progressing.  Both Dr. Watkins and Dr. Green commented on the sedating effect of her medications.  Both Drs. Watkins and Green provided letters extending Shawna's return to work dates. Shortly before the claim was submitted to MCMC, Dr. Watkins wrote a letter stating that, in his opinion, Shawna was unable to resume any type of gainful employment due to her physical impairments and that he expected to see a "continued decline in function over time."  Dr. Green indicated that while Shawna "may" have been able to return to work, it was only with accommodations that addressed the realities of her restrictions and limitations.[60]

Jennings contends Hartford also ignored Dr. Badeer's findings that Jennings could not work "in any position requiring standing or walking" and would require modifications to return to work.

Hartford responds that it did not disregard any of this information, but rather considered it against the whole of the record and in the context of Jennings' sedentary position at work.  The court agrees the administrative record demonstrates Hartford gave reasonable consideration to the medical evidence in the record, including the opinions of Jennings' physicians.

---

[58] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

[59] *Id.*

[60] Dkt. 21 at 16.

Hartford based the initial denial of Jennings' claim on its finding that the medical information did not support "an impairment or worsening or [sic] symptoms that would prevent [Jennings] from performing [her] sedentary job duties."[61]  Jennings argues that because evidence in the administrative record, including statements by Dr. Singleton and Dr. Watkins, illustrates a progressive worsening of her symptoms, Hartford's denial on this basis was arbitrary and capricious.  But while the record shows deterioration in Jennings' condition, that trend is not incompatible with Hartford's articulated basis for denial.  In other words, it is possible that Jennings' symptoms continued to worsen, but had not yet progressed to the point that they rendered Jennings unable to work.

In its appeal determination letter, Hartford referenced the letters from Dr. Watkins and Dr. Green excusing Jennings from work.  The fact that Hartford's decision is not in line with the conclusion drawn in those letters does not signify that it arbitrarily disregarded the physicians' opinions.  Rather, as Hartford outlined in its explanation, it considered the letters but found insufficient medical evidence to support the conclusion that Jennings' symptoms rendered her unable to work in her occupation.[62]  The court finds substantial evidence to support this conclusion.  Dr. Green stated that Jennings could return to work with modifications, and Dr. Badeer concurred.  Both conclusions, and the medical documentation from which they are drawn, provide a "reasoned basis" on which Hartford's decision relies.

---

[61] R. at 000012.

[62] R. at 000006 ("[Y]ou have indicated that you are unable to work due to your physical conditions. However . . . , the medical documentation in your file does not support a functional impairment that would have precluded you from performing the duties of your occupation as a Nurse Auditor as of 1/19/15 forward.").

B.  Essential Elements of the Occupation

Jennings also contends Hartford acted arbitrarily and capriciously by failing to identify and consider all of the essential elements of Jennings' nurse auditor occupation.  Jennings essentially argues Hartford considered only the sedentary nature of her job, without regard to its cognitive demands and the impact of her condition on her ability to meet those demands.

Jennings relies on *Gaither v. Aetna Life Insurance Co* for support.[63]  In *Gaither*, a plan administrator failed to recognize the nature of the claimant's narcotic-related disability, rejecting his claim "without a substantial basis for doing so, without following up on obvious leads, and apparently without specifically considering the claim at all."[64]  The administrator failed to "come to grips" with the fact that "being drug-free" was an essential element of the claimant's occupation.[65]  The Tenth Circuit found the denial was arbitrary and capricious.[66]

Jennings argues Harford similarly abused its discretion here, but the administrative record does not support this argument.  The cognitive demands Jennings identifies – concentration, stamina, mental alertness, and an eye for detail – may very well be essential to the nurse auditor occupation.  However, unlike the administrator in *Gaither*, Hartford neither ignored the cognitive components of the nurse auditor occupation[67] nor failed to investigate whether Jennings was unable to meet those responsibilities.[68]  The court finds Hartford did not act arbitrarily and capriciously concerning Jennings' ability to perform the essential functions of her job.

---

[63] 394 F.3d 792 (10th Cir. 2004).

[64] *Id.* at 806.

[65] *Id.* at 802.

[66] *Id*. at 809.

[67] R. at 000004 ("[Y]our occupation as a Nurse Auditor is a sedentary occupation which involves auditing medical charts verifying the ICD.9 code and CPT codes.").

[68] Hartford specifically inquired as to what affect, if any, Jennings' illness would have on her ability to perform the cognitive demands of her job.  In the APS form, Hartford asked Dr. Watkins whether

C. The "Modifications" Condition

Jennings argues that Hartford acted arbitrarily and capriciously when it determined she was not totally disabled because she could return to work with modifications. Under ERISA, "the imposition of new conditions that do not appear on the face of a plan constitutes arbitrary and capricious conduct."[69] Jennings contends the Plan does not permit Hartford to consider workplace accommodations or modifications in making its determination.

Jennings cites several cases for the proposition that an administrator may not arbitrarily impose an "accommodations condition" into a plan's definition of disability.[70] In this case, however, the Plan incorporates the concept of accommodations or modifications into the disability analysis. Under the Plan's terms, an essential duty is defined as one that: "1) is substantial, not incidental; 2) is fundamental or inherent to the occupation; and 3) *cannot be reasonably omitted or changed*."[71] Even assuming the ability to walk and drive unassisted are essential duties of the nurse auditor occupation,[72] those duties could reasonably be changed to allow Jennings to use an assistive device such as a cane, walker, or wheelchair. For that reason,

---

Jennings had a "psychiatric/cognitive impairment" and whether he believed Jennings was "competent to endorse checks and direct the use of the proceeds." Dr. Watkins marked the boxes "no" and "yes," respectively. R. at 000121. *See also* R. at 000012 ("Our clinician was advised that you were reporting complaints of daytime sedation and leg cramping however; there were no additional diagnostic findings or examination findings provided.").

[69] *Cirulis v. UNUM Corp.*, 321 F.3d 1010, 1013 (10th Cir. 2003).

[70] *See, e.g.*, *Saffle v. Sierra Pacific Power Co. Bargaining United LTD Income Plan*, 85 F.3d 455, 459-460 (9th Cir. 1996).

[71] R. at 000162 (emphasis added).

[72] Hartford maintains that the ability to drive and "ambulate unassisted" are not essential duties of the Nurse Auditor occupation. Dkt. 27 at 25. Jennings, on the other hand, argues that the ability to get to work every day, enter the building, and "move around without assistance" are essential duties. Dkt. 32 at 6. Neither party cites legal authority for their respective positions. Because the court finds that it was not an abuse of discretion for Hartford to condition its denial on the availability of modifications, it need not determine whether the ability to drive and walk unassisted are essential duties.

it was not arbitrary and capricious for Hartford to deny Jennings' claim based on its determination that she could return to work "with modifications."

The court finds Hartford did not act arbitrarily and capriciously in denying Jennings' short-term benefits claim because its determination is based on substantial evidence in the administrative record. Evidence in the record supports the conclusion that Jennings' spastic diplegia affected primarily her lower extremities, and did not preclude her from working in a sedentary position. Both Dr. Green and Dr. Badeer found Jennings could return to work with modifications such as a cane or walker to help her enter and leave the building, and to move around as needed at work. Hartford also had a reasonable basis to conclude that Jennings was capable of performing the cognitive demands of her occupation. Hartford's decision need not be "the superlative one" so long as it lies on the "continuum of reasonableness – even if on the low end." That standard is met here.

### III.     Long-Term Benefits

In her Complaint, Jennings seeks instatement in the long-term disability benefits plan and payment of past long-term benefits due.[73] As Hartford points out, if Jennings applied for long-term benefits, that information is not part of the administrative record in this case. Therefore, the court does not reach this issue.

---

[73] Dkt. 2 at 8.

## CONCLUSION

For the reasons discussed above, the court GRANTS Defendant Hartford's Motion for Summary Judgment[74] and DENIES Jennings' Motion for Summary Judgment.[75]

SO ORDERED this 29th day of March, 2018.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

---

[74] Dkt. 22.

[75] Dkt. 21.